**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-3771
_____

UNITED STATES OF AMERICA

v.

ISSA DIALLO,

Appellant

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 3:09-CR-007)
District Judge: Honorable James M. Munley

_____

Argued October 3, 2012

Before: FUENTES, FISHER, and COWEN,
*Circuit Judges*

(Opinion Filed:  January 15, 2013)

Paul J. Walker, Esq.
Curt M. Parkins, Esq. [ARGUED]
Walker & Comerford Law LLC
Suite C
205-207 N. Washington Avenue
Scranton, PA 18503

  *Counsel for Appellant Issa Diallo*

Peter J. Smith, United States Attorney
Stephen R. Cerutti II, Assistant United States Attorney
             [ARGUED]

United States Attorney's Office
Middle District of Pennsylvania
Ronald Reagan Federal Building
Suite 220
228 Walnut Street
Harrisburg, PA 17108

  *Counsel for Appellee United States of America*

_____

OPINION OF THE COURT

_____

FUENTES, *Circuit Judge*:

  Issa Diallo was arrested and pleaded guilty to knowingly possessing 15 or more counterfeit credit cards with the intent to defraud. At his sentencing hearing, the Government argued that although the actual loss attributed to Diallo's conduct amounted to $160,000, he should be assessed a 16-level enhancement because his intended loss

amount was the maximum that he could have charged on the credit cards, which was $1.6 million. We agree with Diallo's contention that for the purpose of Section 2B1.1 of the Sentencing Guidelines, the intended loss of a credit card fraud is not, in every case, the credit card's credit limit. We therefore vacate and remand for resentencing.[1]

## I.

On December 26, 2008, Diallo used a counterfeit credit card to purchase 26 gift cards, each valued at $100, at a Wegmans Supermarket in Wilkes-Barre, Pennsylvania. The following day, Diallo returned to that supermarket and was arrested. At the time of his arrest, Diallo possessed $920 in cash, a counterfeit North Carolina driver's license, and a counterfeit credit card. After obtaining a search warrant, the Wilkes-Barre Township Police Department searched Diallo's vehicle and recovered 53 counterfeit credit cards, a counterfeit Louisiana driver's license, 24 gift cards, a Global Positioning System (GPS), a laptop computer, a thumb drive, and a skimming device, which is a hand-held device that copies, stores, and encodes credit card information from a credit card's magnetic strip. A subsequent search by Secret Service agents resulted in the discovery of a second thumb drive and another gift card. Searches of the laptop and thumb drives revealed over 200 compromised Discover, Visa, and MasterCard credit card accounts. Through a search of the GPS device, Secret Service agents also discovered the addresses for 12 Wegmans stores, 9 Wawa convenience

---

[1] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

stores, and 3 7-Eleven convenience stores. Wegmans advised agents that during November and December 2008, Diallo had been recorded on store surveillance tapes using a fraudulent credit card to purchase Visa gift cards at Wegmans stores throughout Virginia, Pennsylvania, New Jersey, and New York.

During an interview with Secret Service agents, Diallo admitted to possessing the compromised credit card numbers on his laptop computer and thumb drives. Diallo stated that he had received the account information from another individual and that he could load the account information onto gift cards using the skimming device.

On January 21, 2010, Diallo pleaded guilty to knowingly possessing 15 or more counterfeit access devices, with intent to defraud, in violation of 18 U.S.C. § 1029(a)(3). The parties did not agree to a specific loss amount or the number of victims and reserved the issue for the sentencing hearing. The parties agreed that the sentence would be calculated under U.S.S.G. § 2B1.1, which is the Guideline covering fraud offenses. Prior to sentencing, a U.S. Probation Officer prepared a presentence report, which calculated a total offense level of 27 and criminal history category of I. The total offense level included a 16-level enhancement for an intended loss amount of over $1 million but not more than $2.5 million, which was based on the Secret Service agents' determination of the aggregate credit limit of all of the compromised credit card numbers, and a 4-level enhancement for over 50 victims, based on the number of financial institutions that had issued the credit cards numbers. Diallo objected to both enhancements.

4

At Diallo's sentencing hearing, the Secret Service case agent testified that he had determined that there were 52 victims, consisting of the 51 financial institutions that owned the various credit card numbers and Wegmans Corporation. The agent also testified that while an actual loss of $160,000 could be attributed to Diallo, there was "approximately $1.6 million in potential loss." App. 15) He calculated this potential loss by contacting the 51 financial institutions associated with each credit card to request each card's credit limit, and the total credit limit for the 327 credit cards was $1.6 million. The agent, however, conceded that an individual in possession of a stolen card could not determine its credit limit without a subpoena.

At Diallo's sentencing hearing, the defense argued that "intended loss requires knowledge that the loss is a virtual certainty," and that Diallo did not have "that type of guilty knowledge as to the amount that was available on these cards or that he even had access to these cards." App. 24. In response, the government argued:

> [I]ntended loss isn't necessarily something that is certain.
>
> If you can take someone's credit card, and you can charge up to $20,000 on it, that's the intended loss. That is how much you can get if you try long and hard enough to get it.
>
> The card will stop when there is nothing available any longer, when the credit limit has been reached.

App. 25.

The District Court accepted the Government's arguments on Diallo's intended loss and the number of victims, and it overruled Diallo's objections. The Court's analysis on these two issues consisted of the following: "The intended loss for credit cards he personally used and the cards he manufactured and provided to others totaled $1.6 million. Over 50 financial institutions were affected by his actions. So obviously it is a very serious offense." App. 30-31. The District Court then applied both enhancements, resulting in a total offense level of 27 and a Guidelines range of 70 to 87 months' imprisonment.

After the District Court overruled the objection to the intended loss amount enhancement, Diallo argued that a departure was warranted. He emphasized the fact that the intended loss calculation of $1.6 million is ten times greater than the actual loss, and is "a gross overstatement of the seriousness of this offense." App. 28. While the District Court declined to depart from the Guidelines range, it ultimately sentenced Diallo to a bottom-of-the-Guidelines-range sentence of 70 months' imprisonment.

**II.**

On appeal, Diallo challenges the application of the same two enhancements to which he objected at his sentencing hearing. He maintains that (1) his Guidelines range was improperly calculated because of the District Court's determination that intended loss is simply an aggregation of the credit limits of stolen credit card numbers, despite no evidence that Diallo intended to cause that amount

6

of loss; and (2) the District Court incorrectly increased his offense level by four levels based on a finding that there were over fifty victims when only thirty victims had suffered an actual loss.

The Government has conceded that the number-of-victims enhancement is improper because the applicable Sentencing Guidelines require that victims must have suffered an actual loss, as compared to subsequent Guidelines which additionally included individuals "whose means of identification [were] used unlawfully or without authority." U.S.S.G. § 2B1.1 app. n.4(E) (effective Nov. 1, 2009); s*ee also United States v. Kennedy*, 554 F.3d 415, 419 (3d Cir. 2009) (holding that victims must have suffered an actual pecuniary loss); *United States v. Corrado*, 53 F.3d 620, 622 (3d Cir. 1995) (holding that the earlier Guidelines control when retroactive application of the Guidelines in effect at sentencing would result in more severe penalties). As the Government has conceded that remand for resentencing on this enhancement is appropriate, we will only consider the question of Diallo's intended loss amount.

**A.**

Section 2B1.1 of the Sentencing Guidelines provides that the offense level is to be increased based on the loss amount for offenses involving fraud, as well as other larceny and theft offenses. For offenses resulting in a loss greater than $120,000, there is a 10-level increase, and when there is a loss greater than $1 million, there is a 16-level increase. U.S.S.G. § 2B1.1(b)(1). "Loss" is defined as "the greater of actual loss or intended loss." *Id.* app. n.3(A). "Intended loss" is defined as "the pecuniary harm that was intended to result

from the offense[] and includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)." *Id.* app. n.3(A)(ii). In estimating loss, the application notes advise, "[t]he court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference." *Id.* app. n.3(C). This appeal requires us to determine how sentencing courts should calculate what "pecuniary harm was intended to result" from credit card fraud when the fraud's perpetrator did not know the credit limit, which is the potential loss amount from the stolen credit card.

As we have not yet addressed this question, the parties urge us to consider extra-Circuit authority to determine how to calculate intended loss in a credit card fraud. Diallo asks the Court to adopt the reasoning of the Tenth Circuit in *United States v. Manatau*, 647 F.3d 1048 (10th Cir. 2011). In *Manatau*, the Tenth Circuit stated that "'intended loss' means a loss the defendant *purposely* sought to inflict. 'Intended loss' does not mean a loss that the defendant merely *knew* would result from his scheme or a loss he might have *possibly and potentially* contemplated." *Id.* at 1050 (emphasis in original). The Court looked at the plain language and context of the Guideline and background legal norms, and it held that "a court cannot simply calculate 'intended loss' by toting up credit limits without any finding that the defendant intended to inflict a loss reasonably approaching those limits." *Id.* at 1056-57. The Government, however, cites cases from the Fifth, Seventh, and Eighth Circuits, that it contends support

its view that aggregating the total credit limit is the proper method to calculate intended loss. *See United States v. Harris*, 597 F.3d 242 (5th Cir. 2010); *United States v. Bonanno*, 146 F.3d 502 (7th Cir. 1998); *United States v. Staples*, 410 F.3d 484 (8th Cir. 2005). However, all of these cases are distinguishable from the facts before us as the cases involved either defendants who recklessly transferred the credit information to a third party, thereby placing the full potential loss at risk, or defendants who had knowledge of and actually intended the maximum potential loss.

While we have not specifically considered how to estimate the intended loss of a credit card fraud, we have addressed how intended loss should be calculated under analogous circumstances where the defendant had not necessarily expected to capture the full potential loss. As with other sentencing enhancements, we employ a burden-shifting framework to establish that an enhancement applies. "[T]hough the government bears the burden of proof in guidelines cases, the burden of production may shift to the defendant once the government presents prima facie evidence of a given loss figure." *United States v. Geevers*, 226 F.3d 186, 188 (3d Cir. 2000). However, the government always bears the burden of proving by a preponderance of the evidence that the facts support a sentencing enhancement, and "the defendant does not have to prove the negative to avoid the enhanced sentence." *United States v. Evans*, 155 F.3d 245, 253 (3d Cir. 1998) (internal quotation marks and citation omitted).

We looked at how sentencing courts should calculate intended loss in *United States v. Kopp*, 951 F.2d 521 (3d Cir. 1991). In *Kopp,* the district court sentenced the defendant based on the full value of the bank loan that his fraudulent

misrepresentation had secured, rather than determining the victim-bank's actual loss or evaluating the defendant's claim that he intended to repay the loan. *Id.* at 525-26. We rejected a "[m]echanical application of the theft guidelines in fraud cases" and remanded the case after finding that the district court made no findings on actual or intended loss. *Id.* at 529, 536. We cautioned that the fraud Guideline "has never endorsed sentencing based on the worst-case scenario *potential* loss" and admonished sentencing courts to consider actual or intended harm. *Id.* at 529 (emphasis in original). To make this determination, we look to the "defendant's subjective expectation, not to the risk of loss to which he may have exposed his victims." *United States v. Yeaman*, 194 F.3d 442, 460 (3d Cir. 1999). Nevertheless, "[w]hile intended loss may not be automatically determinable based on what the potential loss is, intended loss may still equal potential loss." *Geevers*, 226 F.3d at 192. However, the *Geevers* Court cautioned, "[i]t is clear that a district court errs when it simply equates potential loss with intended loss without deeper analysis." *Id.*

*Geevers* involved a check kiting scheme, whereby Geevers had opened numerous bank accounts by depositing checks from closed accounts or accounts with insufficient funds and then attempted to withdraw some of the funds before the victim bank realized the checks were not backed. *Id.* at 188-89. Geevers had deposited checks with face values of $2 million, had attempted to withdraw or transfer about $400,000, and had managed to withdraw or transfer over $160,000. *Id.* at 189. The government argued that the intended loss amount was the total face value of the deposited checks. *Id.* Geevers, however, argued that it was not his intention to steal the total face value of the checks and that he

could not have possibly successfully withdrawn that amount. *Id.* at 189-90. We found Geevers's contention of impossibility irrelevant, noting "impossibility does not require a sentencing court to lower its calculation of intended loss." *Id.* at 195. Instead, the Court found that even though it was likely that Geevers did "not expect to obtain the full amount of his fraudulent checks[,] . . . expectation is not synonymous with intent when a criminal does not know what he may expect to obtain, but intends to take what he can." *Id.* at 193.

To the contrary, focusing on Geevers's argument regarding intent, the Court held that "a reasonable inference may be drawn that a defendant in Geevers's position intends to cause the full loss of the face value of his false checks." *Id.* at 192. Based on that reasonable inference, "the government has made its prima facie case," and under our burden-shifting framework, the defendant "is free to come forward with evidence to demonstrate that he actually intended something less." *Id.* at 193. Still the *Geevers* Court cautioned sentencing courts that "the face value of the deposited checks is not to be mechanically assumed to be the intended loss." *Id.* at 194. Furthermore, even after determining the intended loss amount, district courts must consider whether the loss amount properly accounts for the seriousness of the offense and if not, whether to depart downward or upward. "[I]f any such augmentation caused the properly calculated 'loss' to overstate the seriousness of the offense," then the district court may depart downward. *Kopp*, 951 F.2d at 523. "Correspondingly, if the court finds that the 'loss' understates the seriousness of the offense (which might be the case if actual and intended loss were zero and the risk of loss were significant), it may depart upward . . . ." *Id.*

11

In *United States v. Titchell*, 261 F.3d 348, 353-54 (3d Cir. 2001), we reinforced the *Geevers* requirement that district courts must conduct a "deeper analysis" before drawing the inference that a defendant intended to cause the full potential loss. In *Titchell*, the defendant had been convicted of mail fraud after mailing out fictitious invoices totaling $17,577,525 for the renewal of Yellow Pages advertising. *Id.* at 352. The defendant made at least $647,000 from this scheme. *Id.* At sentencing, the entirety of the district court's analysis was: "In this case the bulk mailing did (sic) defendant was found guilty of contained 119,575 bogus renewal invoices at a quote of $147 a piece. Thus, intended loss was $17,577,525. Therefore, the increase is warranted and the base offense level is increased to 21." *Id.* at 353 (internal quotation marks omitted) (alterations in original). On appeal, we found that the district court's mere reference to the potential loss calculation, without any "attempt to explain or justify why the potential loss . . . should be considered to be the same as the intended loss," constituted error. *Id.* at 353-54. We reproached the government for its argument that district courts can implicitly draw reasonable inferences that a defendant intended to cause the full potential loss, noting, "if district courts could silently draw such inferences, there would be little left of *Geevers*' admonition that district courts must perform a 'deeper analysis' than simply calculating potential loss." *Id.* at 354. Here, we must determine whether the District Court performed the requisite "deeper analysis" in calculating Diallo's loss amount.

## B.

At Diallo's sentencing, a Secret Service agent testified that he and his colleagues had contacted each financial

institution to determine the credit limit for each account number that Diallo had possessed and that the aggregate credit limit totaled $1.6 million. Only $160,000 in fraudulent activity could be attributed to Diallo. The agent also testified that an individual in possession of a stolen card would not be able to determine the credit limit without a subpoena to the financial institution. Finally, the agent testified that Diallo possessed a skimming device, which copies, stores, and encodes credit card information, and that Diallo was perpetrating his scheme at Wegmans stores from Virginia to New York.

The United States probation officer who prepared Diallo's presentence investigation report relied on the Secret Service's determination that "[b]ased on the credit limit of each card, the intended loss amount was more than $1,600,000 but less than $2,500,000" and added 16 levels pursuant to U.S.S.G. § 2B1.1(b)(1)(I). Confidential Presentence Report ("PSR") ¶¶ 13, 20. The defense objected to the 16-level enhancement at sentencing, arguing that Diallo did not have "that type of guilty knowledge as to the amount that was available on these cards." App. 24. The defense cited case law from outside of this Circuit in support of its view that "intended loss requires knowledge that the loss is virtual certainty," which is not present in this case. *Id.* The Government responded that "If you can take someone's credit card, and you can charge up to $20,000 on it, that's the intended loss. That is how much you can get if you try long and hard enough to get it." App. 25. The District Court, with no analysis, overruled Diallo's objection to the intended loss enhancement. Diallo then argued for a downward departure, stating that as the intended loss calculation is ten times the actual loss, "the intended loss is really a gross overstatement

of the seriousness of this offense." App. 28. In sentencing Diallo, the entirety of the District Court's analysis on the intended loss amount was as follows: "The intended loss for credit cards he personally used and the cards he manufactured and provided to others totaled $1.6 million." App. 30-31.

In this case, as in *Titchell*, the District Court did not heed our warning that "it is error for a district court simply to equate [potential loss and intended loss] without 'deeper analysis.'" *Titchell*, 261 F.3d at 354 (citing *Geevers*, 226 F.3d at 192). Here, there was no "deeper analysis" by the District Court as to whether Diallo intended the maximum potential loss by "maxing out" each and every credit card number that he fraudulently possessed. It is possible that the District Court relied on the Secret Service agent's testimony that the search of his car uncovered a skimming device; the evidence that Diallo has traveled from Virginia to New York in order to use the fraudulent credit cards; that Diallo had already spent $160,000 and was continuing to make additional purchases; or that at the time of his arrest, Diallo had returned to a store where he had made $2,600 in purchases just one day prior. It is also conceivable that the District Court agreed with the Government's argument that Diallo intended to charge up to the credit limit on every credit card number found in his possession. On the other hand, the District Court might simply have incorrectly presumed that the aggregate credit limit alone can make out a prima facie case for intended loss amount in a credit card fraud. Given that the District Court sentenced Diallo to 70 months, the bottom of his 70-to-87-months Guidelines range, perhaps the District Court accepted the defense's argument that the intended loss amount grossly overstated the seriousness of Diallo's conduct. But from the District Court's statement at sentencing—"The intended loss

14

for credit cards he personally used and the cards he manufactured and provided to others totaled $1.6 million" App. 30-31—we would be speculating as to what evidence or argument was the basis for the District Court's finding that $1.6 million was Diallo's intended loss amount. This type of "speculation 'is inappropriate' in light of the inherently discretionary nature of the sentencing court's decision." *United States v. Knight*, 266 F.3d 203, 208 (3d Cir. 2001) (citing *United States v. Pollen*, 978 F.2d 78, 89-90 (3d Cir. 1992)).

## C.

We cannot say as a matter of law that the District Court's error was harmless. The possibility exists that the District Court, on remand, may find that the Government fails to prove by preponderance of the evidence that Diallo intended to use each and every fraudulent credit card until the entire $1.6 million aggregate credit limit was depleted. If so, it may find that the actual loss of $160,000 is a more reasonable estimate of loss. Based on that loss amount, the District Court would increase the offense level by ten, rather than sixteen, resulting in a total offense level of 21 instead of 27, leading to a Guidelines range of 37 to 46 months' imprisonment. U.S.S.G. ch. 5, pt. A.[2] Of course, on remand, the District Court may also better justify its conclusion that Diallo intended to commit the maximum potential loss.

---

[2] This Guidelines range does not incorporate the additional reduction that would occur on remand based on the number-of-victims enhancement.

Thus, we must remand to the District Court to determine the intended loss amount and whether a departure is warranted based on the intended loss amount overstating or understating the seriousness of the offense. *See United States v. Langford*, 516 F.3d 205, 217 (3d Cir. 2008) ("[W]e cannot presume that a district court would have imposed the same sentence, given the opportunity to consider the correctly calculated Guideline.").

## III.

Accordingly, the Judgment of Sentence of the District Court entered on September 7, 2010 will be vacated and the case remanded for resentencing in conformity with this opinion.