**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-4334
_____

UNITED STATES OF AMERICA

v.

OUSAMANE BARRY,

Appellant

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(District Court Nos. 3-09-cr-00220-002)
District Judge:  Honorable James M. Munley

_____

Argued on July 18, 2013

(Filed: August 5, 2013)

Before:  RENDELL, SMITH and ROTH,  <u>Circuit Judges</u>

Michael J. Diamondstein, Esquire
Jason D. Javie, Esquire **(Argued)**
Two Penn Center
Suite 900
1500 John F. Kennedy Boulevard
Philadelphia, PA   19102

Counsel for Appellant

Peter J. Smith, Esquire
United States Attorney
Michelle L. Olshefski, Esquire **(Argued)**
Amy C. Phillips, Esquire
Assistant United States Attorney
235 North Washington Avenue
Scranton, PA   18503

Counsel for Appellee

_____

O P I N I O N

_____

**RENDELL**, Circuit Judge:

Appellant Ousamane Barry was convicted after a jury trial of three counts of unauthorized use of counterfeit access devices and one count of conspiracy to use counterfeit access devices in connection with a scheme to use fraudulent credit cards throughout New Jersey and Pennsylvania.  Thereafter, Barry was sentenced to 41 months' incarceration, two consecutive two-year terms of supervised release, restitution, and a $400 special assessment.  Barry now appeals the judgment of conviction and the sentence imposed.  For the reasons stated below, we will affirm the judgment of conviction, but we will remand with respect to sentencing.

I.   Background

On February 28, 2009, police responded to a call from the Clinton Township Wal-Mart loss prevention department.  When the police arrived at the store, they were informed that two men had attempted to purchase merchandise with stolen or fraudulent

credit cards. Police officers took the two men—Abdoulaye Ndour and Addis Aka—into custody, and were then joined by Officer Santoro, who later testified at Barry's trial.

Officer Santoro was informed that two men were acting suspiciously in a van in the Wal-Mart parking lot. After Ndour and Aka admitted that the two men—who turned out to be Barry and another co-defendant, Ousamane Camara—were with them, Officer Santoro approached the van. Through the van's windows, he could see several laptop computer boxes and Wal-Mart bags filled with merchandise, including several Nintendo game systems. Police obtained consent to search the vehicle from Camara, who was sitting in the driver's seat. Officer Santoro observed three to six credit cards stuffed into the driver's side seatbelt housing when Camara stepped out of the vehicle. Police also found five laptop boxes when Camara opened the van's back hatch, and three additional Wal-Mart bags filled with Nintendo DS gaming systems when Camara opened the side door. After Barry, who was sitting in the passenger seat, stepped out of the van, officers saw an additional four to six credit cards stuffed in the passenger side seatbelt housing. Barry and Camara were then taken into custody. During an inventory search after the van was towed, police found receipts from Wal-Marts in Phillipsburg and Wilkes-Barre, Pennsylvania, all dated February 28, 2009. A total of 81 credit cards were discovered in the van.

Further investigation by the United States Secret Service revealed that the credit cards were counterfeit or fraudulent,[1] and that the men had made other fraudulent

---

[1] The record does not indicate the precise way in which the credit cards were created, altered, or otherwise rendered counterfeit or fraudulent.

purchases at Wal-Mart stores in New Jersey and Pennsylvania. Secret Service Agent Jason Wolfson contacted the financial institutions associated with the account numbers to verify that the accounts were compromised. The financial institutions provided the potential exposure with respect to each card, and Agent Wolfson arrived at a total potential exposure of $675,170 by aggregating the maximum individual exposure on each account associated with the 81 credit cards found in the van.

On July 21, 2009, a grand jury in the Middle District of Pennsylvania issued an indictment charging Barry with three counts of credit card fraud in violation of 18 U.S.C. § 1029 and one count of conspiracy in violation of 18 U.S.C. § 371. Barry, along with his co-conspirator Camara, proceeded to trial on April 23, 2012. Barry's chief defense was that he was in the van simply to be driven home from a wedding, that he did not know that the other men were engaged in criminal activity, and that he had committed no crimes.

During the course of the three-day trial, Officer Santoro testified for the government. On cross-examination, defense counsel attempted to elicit testimony that would support Barry's chief defense by asking Officer Santoro, "Did Mr. Barry ever make any type of confessions or admissions to you that he knew what these guys were up to, that he knew they were engaged in criminal activity?" (App. 138.) On redirect, the government attempted to refute the suggestion that Barry was not aware that the other men were engaged in criminal activity:

> Q: Attorney Comerford asked you whether or not Mr. Barry said anything to you. Do you recall that testimony?

A:      Yes.

Q:      Did Mr. Barry ever say to you, hey, I was at a wedding. I don't
        know what these guys were up to, but I had nothing to do with it?
        Did he ever say that to you that day?

A:      No.

Q:      At any point did he ever say that?

A:      No. Until you just said it, that was the first time I was being made
        aware of that.

(App. 147.)

Barry's attorney objected immediately:

Mr. Comerford: Your Honor, I think we're in a gray area here. I really
        don't think we can use a Defendant's silence as evidence against
        him, and that's what she's doing.

Ms. Olshefski: Your Honor, he opened the door on cross examination to
        what, if anything, Mr. Barry said when he was in the company of
        this police officer.

The Court: Would you repeat that again?

Ms. Olshefski: Attorney Comerford opened the door to that question when
        he asked Officer Santoro what, if anything, Mr. Barry said while he
        was in the company of Officer Santoro.

The Court: Sustain the objection.

(*Id.*)

The government also presented Ndour and Aka as witnesses. They testified that

all four men knew each other, and that they traveled between Virginia and New York to

use the fraudulent credit cards. The government also presented testimony from Amadou

5

Diallo, who knew Barry and Camara from New York, and testified that the three men used counterfeit credit cards throughout Pennsylvania.

In the defense case, Barry testified on his own behalf, claiming that he had no idea why the van stopped at multiple Wal-Marts and that he was merely getting a ride home from a wedding. Barry presented a photograph of him in the bride's home to corroborate his story, although the photograph had no date stamp. Barry also testified that he did not know Ndour or Aka prior to the trip and that "I never committed those crimes. I swear to God." (App. 423.)

The jury returned a guilty verdict on all counts.

In preparation for sentencing, the United States Probation Office prepared a pre-sentence report on June 19, 2012, finding that Barry's total offense level was 22—which included a 14-level enhancement for intended loss in excess of $400,000 but less than $1 million and a 2-level enhancement for obstruction of justice based on Barry providing false testimony at trial—and a criminal history category of I. The PSR recommended a term of imprisonment between 41 and 51 months and a term of supervised release of three years.

Barry objected to the enhancements, and at his sentencing on November 8, 2012, the District Court heard testimony and argument on those enhancements. The government offered testimony from Agent Wolfson, who detailed the manner in which he determined the potential exposure amount of each credit card and concluded from his research that the aggregate potential exposure as to the 81 cards found in the van was $675,170. Barry offered no testimony or other evidence into the record on the intended

loss issue.  The District Court also heard argument regarding the obstruction of justice enhancement.

At the conclusion of the hearing, the District Court held that the intended loss calculation of $675,170 was appropriate based on Agent Wolfson's testimony, argument from both parties, and the PSR.[2]  The District Court also credited the government's argument that Barry's testimony was not believed to be truthful, and therefore found that the obstruction of justice enhancement was proper.  The District Court then sentenced Barry to 41 months' imprisonment, restitution in the amount of $13,396.62, and a special assessment of $100 on each count ($400 in total).

Barry's timely appeal followed.

## II.  Discussion

Barry raises three issues on appeal: (1) that the government violated his due process rights pursuant to *Doyle v. Ohio* by eliciting testimony at trial regarding his post-arrest silence; (2) that his sentence was unreasonable because the intended loss calculation equated potential loss with intended loss; and (3) that the District Court erred by adding a 2-point enhancement for obstruction of justice.

### A.  *Doyle* Violation

---

[2] For the purposes of sentencing, the District Court considered only the 81 cards found in the van, whose aggregate limit was $675,170, as opposed to the 102 cards "that were part of the investigation" (App. 590), whose aggregate limit was $863,015.  This did not affect the District Court's application of the intended loss calculation, however, as in either case, the value was in excess of $400,000 but less than $1 million, which would result in a 14-level increase under U.S.S.G. § 2B1.1(b)(1).

Barry argues that his conviction should be vacated because the government violated his due process rights pursuant to *Doyle v. Ohio*, 426 U.S. 610 (1976). Under *Doyle v. Ohio*, a prosecutor violates a defendant's due process rights when she questions his post-arrest and post-*Miranda* silence to impeach his trial testimony. *Id.* at 611; *see also Hassine v. Zimmerman*, 160 F.3d 941, 947 (3d Cir. 1998). Barry's due process violation claim is subject to plenary review. *Gov't of the Virgin Islands v. Davis*, 561 F.3d 159, 163 (3d Cir. 2009). *Doyle* violations claims are then subject to harmless error review. *Gov't of the Virgin Islands v. Martinez*, 620 F.3d 321, 335 (3d Cir. 2010). "Accordingly, we ask first whether a violation occurred and, if it did, we ask whether it had an effect on the jury's verdict beyond a reasonable doubt." *Id.*

In this case, we need not dwell on whether the government's examination of Officer Santoro was indeed a *Doyle* violation, because even if it was, it was harmless. The government's question to Officer Santoro that implicated Barry's post-arrest, post-*Miranda* silence was only asked once, and Barry's objection was immediately sustained. *See United States v. Agee*, 597 F.2d 350, 359 (3d Cir. 1979) (assuming that a question fell within the *Doyle* proscription, but finding it harmless because "[t]his is not a case in which repetitive questioning focused the jury's attention on the defendant's silence. . . . Only a single question was involved here"). Nor did the government dwell on this question during closing arguments.

Furthermore, importantly, there was sufficient other evidence to suggest that Barry was convicted for reasons other than the prosecutor's possibly improper question. For instance, three cooperating witnesses—Diallo, Aka, and Ndour—testified consistently

8

that they had assisted Barry in a scheme to fraudulently purchase merchandise from Wal-Mart stores throughout Pennsylvania and New Jersey since September 2008. The government also presented surveillance photographs from a Wal-Mart that showed Barry, as identified by Diallo, inside the Wal-Mart "doing his own thing" while Diallo used a fraudulent card on January 19, 2009. (App. 211-13.) Additionally, police officers discovered fraudulent credit cards in the seatbelt housing next to where Barry was seated.

Given the overwhelming evidence—both testimonial and physical—that Barry was indeed an active participant in the fraudulent scheme, the government's question regarding Barry's post-arrest, post-*Miranda* silence—even if it was a *Doyle* violation—was "harmless beyond a reasonable doubt." *United States v. Waller*, 654 F.3d 430, 438 (3d Cir. 2011) ("When the error found is of a constitutional nature, a court may nonetheless uphold the conviction if the error was 'harmless beyond a reasonable doubt.'" (citations omitted)).

### B. Sentencing

We review a district court's sentence for abuse of discretion in two stages. First, we review for procedural error—for example, failing to correctly compute the Guidelines range. *United States v. Wright*, 642 F.3d 148, 152 (3d Cir. 2011). If we find procedural error at any step, we will generally "remand the case for re-sentencing without going any further." *Id.* (quoting *United States v. Merced*, 603 F.3d 203, 215 (3d Cir. 2010)). If there is no procedural error, the second stage of our review is for substantive reasonableness. *Id.*

If we decide that a district court misapplied the Guidelines, "a remand is appropriate unless the reviewing court concludes, on the record as a whole, that the error was harmless, i.e., that the error did not affect the district court's selection of the sentence imposed." *United States v. Smalley*, 517 F.3d 208, 212 (3d Cir. 2008) (internal quotation marks and citations omitted).

### 1. Intended Loss

In calculating the appropriate Guidelines range, the Sentencing Guidelines mandate that a sentencing court increase the offense level according to a schedule of loss amounts. U.S.S.G. § 2B1.1(b)(1). Sentencing courts are directed to use "the greater of the actual or intended loss" in applying § 2B1.1(b).[3] In this case, the District Court equated the potential loss—$675,170, or the aggregate credit limits[4]—with the intended loss, despite the fact that the actual loss was only $13,396.33. (PSR ¶ 13.) This resulted in the District Court's increasing Barry's offense level by 14 points. U.S.S.G.

---

[3] Actual loss refers to the reasonably foreseeable pecuniary harm that actually occurred, and intended loss refers to the loss which the offender intended, including harm that would be unlikely or impossible to occur. U.S.S.G. § 2B1.1 app. n.3(A)(i) & (ii).

[4] The District Court relied on the testimony of Agent Wolfson for this figure. Barry argues that the District Court's decision to credit Agent Wolfson's hearsay testimony was erroneous, but this argument is unpersuasive. A sentencing judge may "consider responsible unsworn or 'out-of-court' information relative to the circumstances of the crime and to the convicted person's life and characteristics," *Williams v. Oklahoma*, 358 U.S. 576, 584 (1959), and a district court's decision to credit hearsay testimony is subject to clearly erroneous review, *United States v. McGlory*, 968 F.2d 309, 347 (3d Cir. 1992). The District Court's reliance on Agent Wolfson's spreadsheets listing the applicable credit limits for each card was not clearly erroneous.

§ 2B1.1(b)(1) (loss of more than $400,000 but less than $1,000,000 results in the addition of 14 points). The actual loss amount would have resulted in only a 4-point increase. *Id.*

The District Court sentenced Barry on November 8, 2012 without the benefit of our opinion in *United States v. Diallo*, 710 F.3d 147 (3d Cir. 2013). In *Diallo*, we addressed a nearly identical situation in which the defendant traveled throughout Virginia, Pennsylvania, New Jersey, and New York using fraudulent credit cards. *Id.* at 148. While the actual loss attributable to the defendant was $160,000, a Secret Service case agent testified that the total credit limit of the credit cards was approximately $1.6 million. *Id.* at 149. Over the defendant's objections, the government argued that this figure should be the "intended loss" for the purposes of sentencing. *Id.* The district court accepted the government's arguments, and increased the defendant's offense level by 16 points.

On appeal, we considered "how sentencing courts should calculate what 'pecuniary harm was intended to result' from credit card fraud when the fraud's perpetrator did not know the credit limit, which is the potential loss amount from the stolen credit card." *Id.* at 150 (quoting U.S.S.G. § 2B1.1(b)(1) app. n.3 (A)(ii)). Looking to *United States v. Geevers*, 226 F.3d 186 (3d Cir. 2000), we held that "'[w]hile intended loss may not be automatically determined based on what the potential loss is, intended loss may still equal potential loss.'" *Diallo*, 710 F.3d at 151 (quoting *Geevers*, 226 F.3d at 192). We noted, however, that "'[i]t is clear that a district court errs when it simply equates potential loss with intended loss without deeper analysis.'" *Id.* (quoting *Geevers*, 226 F.3d at 192). Instead, a burden-shifting framework is appropriate in such cases.

11

"[T]hough the government bears the burden of proof in guidelines cases, the burden of production may shift to the defendant once the government presents prima facie evidence of a given loss figure." *Id.* (quoting *Geevers*, 226 F.3d at 188).

With respect to the defendant's sentencing in *Diallo*, we found that the district court had not engaged in the requisite "deeper analysis." We noted that:

> [i]t is possible that the District Court relied on the Secret Service agent's testimony that the search of his car uncovered a skimming device; the evidence that Diallo has traveled from Virginia to New York in order to use the fraudulent credit cards; that Diallo had already spent $160,000 and was continuing to make additional purchases; or that at the time of his arrest, Diallo had returned to a store where he had made $2,600 in purchases just one day prior. It is also conceivable that the District Court agreed with the Government's argument that Diallo intended to charge up to the credit limit on every credit card number found in his possession. On the other hand, the District Court might simply have incorrectly presumed that the aggregate credit limit alone can make out a prima facie case for intended loss amount in credit card fraud. . . [W]e would be speculating as to what evidence or argument was the basis for the District Court's finding that $1.6 million was Diallo's intended loss amount.

*Id.* at 153. Accordingly, we remanded to the district court to determine the intended loss amount and whether a departure was warranted based on the intended loss amount overstating or understating the seriousness of the offense. *Id.* at 154.

In this case, the District Court overruled Barry's objection to the calculation simply by stating: "We have overruled the objection. I do that based on the testimony that I received here today, based on the arguments by both government and the defendant. And having—appreciating the burden is on the government—proved this by a preponderance of the evidence." (App. 596-97.) This falls short of the "deeper analysis" required under *Diallo* and *Geevers*. Furthermore, it is clear that this error affected the

12

District Court's sentence, as the District Court increased Barry's offense level by 14 points, resulting in a Guidelines range of 41 and 51.[5]

Accordingly, we will vacate Barry's sentence and remand to allow the District Court to engage in the "deeper analysis" required under our law to assess whether Barry intended to charge up to the limit on each card. *Diallo*, 710 F.3d at 153.

2. Obstruction of Justice

Barry also objects to the District Court's addition of a 2-point enhancement for obstruction of justice. Under the Sentencing Guidelines, the offense level is to be increased by 2 levels

> [i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

U.S.S.G. § 3C1.1. The official commentary identifies perjury as an example of conduct warranting imposition of the enhancement. *Id.* at § 3C1.1 app. n.4(B).

As we stated in *United States v. Miller*, 527 F.3d 54 (3d Cir. 2008), to trigger the application of this enhancement, a defendant must give "false testimony concerning a material matter with the willful intent to provide false testimony." *Id.* at 75 (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (2003)). The Supreme Court also addressed this enhancement in *United States v. Dunnigan*, when it found that "[a] witness testifying

---

[5] Had the District Court considered the actual loss amount of $13,396.33, Barry's offense level would have been increased by 4 points, which would have resulted in a Guidelines range of 10-16 months. (Appellant's Br. at 18-19.)

under oath or affirmation violates [the federal criminal perjury statute] if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." 507 U.S. at 94. Although it is preferable that the district court address each element of the alleged perjury in a separate and clear finding, separate findings are not required by *Dunnigan*. *Dunnigan*, 507 U.S. at 95; *see also United States v. Boggi*, 74 F.3d 470, 479 (3d Cir. 1996) (rejecting defendant's argument that the district court must make an independent finding of perjury under *Dunnigan*). Furthermore, a guilty verdict not set aside binds the sentencing court to accept the facts necessarily implicit in the verdict. *Id.* at 478-79. We review a district court's factual finding of willful obstruction of justice for clear error. *United States v. Powell*, 113 F.3d 464, 467 (3d Cir. 1997).

Barry was on trial for credit card fraud and conspiracy to commit credit card fraud. It is uncontested that Barry testified under oath. Furthermore, it is uncontested that he provided testimony on material matters. The only question is whether that material testimony was false, so as to warrant an enhancement. Barry testified, *inter alia*, that he had not provided any co-conspirator with credit cards, which was contradicted by the testimony of Diallo. (App. at 422, 199.) Barry also testified that he had no idea why the van was stopping at Wal-Marts. (App. at 420.) Because a sentencing court is bound to accept the facts necessarily implicit in the jury's verdict, the District Court was bound to accept that the jury found that Barry intended to defraud (an element of credit card fraud) and that he knew the object of the conspiracy (an element of conspiracy). The jury's findings therefore confirm that it did not credit Barry's testimony. *See Boggi*, 74 F.3d at

14

478-79 (finding defendant's testimony not credible, both in the court's own judgment and as a necessary implication of the jury's verdict); *see also United States v. Fiorelli*, 133 F.3d 218, 221 ("[W]here the record establishes that the district court's application of the enhancement necessarily included a finding as to the elements of perjury, and those findings are supported by the record, we will not remand merely because the district court failed to engage in a ritualistic exercise and state the obvious for the record." (internal quotation marks and citation omitted)).

At sentencing, the government's burden is "preponderance of the evidence"—the jury's verdict demonstrates by a preponderance of the evidence that the jury discredited at least some of Barry's testimony and therefore warrants the District Court's application of the obstruction of justice enhancement.

## III. Conclusion

For the reasons stated above, we will affirm the District Court's judgment of conviction and remand for re-sentencing for the deeper analysis regarding the determination of intended loss required by our precedent.