**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-3059
_____

UNITED STATES OF AMERICA

v.

MALIK J. MOSS,
a/k/a Bleek,

Appellant

_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. Criminal No. 1:22-cr-00024-001)
District Judge: Hon. Colm F. Connolly

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
November 12, 2024

Before: RESTREPO, MONTGOMERY-REEVES, AMBRO,
*Circuit Judges*

(Filed: February 18, 2025)

Daniel C. Breslin
LAW OFFICE OF CHRISTOPHER S. KOYSTE, LLC
709 Brandywine Boulevard
Wilmington, DE 19809
    *Counsel for Appellant*

David C. Weiss, Unites States Attorney
Jesse S. Wenger, Assistant United States Attorney, Chief of
Appeals
Benjamin L. Wallace, Assistant United States Attorney
Alexander P. Ibrahim, Assistant United States Attorney

U.S. DEPARTMENT OF JUSTICE
OFFICE OF UNITED STATES ATTORNEY
1313 N Market Street
Hercules Building, Suite 400
Wilmington, DE 19801
    *Counsel for Appellees*

_____

OPINION OF THE COURT

_____

RESTREPO, *Circuit Judge*

Appellant Malik Moss appeals his 384-month sentence for conspiracy to distribute methamphetamine and heroin in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. He contends that the record does not support the District Court's factual findings related to (1) the weight and purity of the methamphetamine and (2) the application of the obstruction-of-justice enhancement. Seeing no clear error in the District Court's findings, we will affirm the judgment.

## I. BACKGROUND

After Moss pleaded guilty to conspiracy to distribute methamphetamine and heroin, the District Court held an evidentiary hearing to determine the quantity and purity of the methamphetamine attributable to him for sentencing purposes. At the hearing, the government focused on two purchases by Moss and his co-conspirator Jacob Santiago to establish drug quantity: one on or about October 27–28, 2021, and another on November 11, 2021. As to the first purchase, DEA Task Force Officer Trevor Riccobon testified that a phone call between Santiago and Moss on October 27 revealed that they collectively planned to buy ten pounds of crystal methamphetamine from a supplier in Reading, Pennsylvania. Cellphone data also showed that Moss's cellphone traveled from Wilmington to Reading on October 27 and 28. The government then presented multiple communications by Moss related to the purchase. Moss texted several people on the night of October 28

2

broadcasting that he had methamphetamine for sale. And in a recorded phone call on November 3, 2021, Moss told another co-conspirator that Reading is "where the ice [*i.e.*, methamphetamine] is" and that he "just went up there" and "bought 10 pounds of ice." App. 57.

As for the November 11 purchase, Officer Riccobon testified that cellphone data showed Moss, Santiago, and another co-conspirator traveled to Reading that day. In a phone call between Santiago and Moss on November 12, Santiago confirmed with Moss that they had five "pound traps" lined up to sell. App. 89. After considering Officer Riccobon's testimony, the wiretap transcripts, and the exhibits submitted by the government, the District Court determined that the government established by "more than a preponderance" that Moss and Santiago bought fifteen pounds of methamphetamine. App. 12–13.

As to purity, the District Court relied on the purity levels of controlled purchases made directly from Moss. Samples from four controlled purchases had purity levels of 95%, 95%, 94%, and 62%. Affording Moss "lenity on this issue," the District Court applied a purity level of 62%—the lowest known purity level of any methamphetamine purchase associated with the conspiracy—to calculate Moss's sentence. App. 14.

The evidentiary hearing was initially scheduled for December 12, 2022, but it was rescheduled for December 21 because of Santiago's absence. During the December 12 proceeding where the hearing was rescheduled, the government notified the District Court that a cooperating co-conspirator—who had been scheduled to testify against Moss—wished to breach his cooperation agreement and no longer testify. Of note, Moss's girlfriend Shannon Ruth and her friend Sharee Christian attended the December 12 proceeding but arrived after the discussion of the co-conspirator's decision.

At the December 21 evidentiary hearing, U.S. Marshals spotted Christian trying to record the proceeding with her phone. The government later submitted a letter to the District Court detailing evidence it obtained from Moss's prison communications showing that Moss had arranged for his girlfriend to record the original and rescheduled evidentiary hearings to expose the cooperating co-conspirator. The letter also outlined

evidence that, while in prison, Moss sent the co-conspirator notes threatening his family's safety if he testified against Moss. Based on these findings, the government informed the District Court that it would seek an enhancement for obstruction of justice.

At Moss's sentencing hearing, the District Court reviewed the prison communications about the planned recording of the evidentiary hearing and heard testimony from the co-conspirator about the threatening notes he received. The District Court concluded that either ground would justify an obstruction-of-justice enhancement. Accordingly, it applied the enhancement and added two points to Moss's base offense level. The District Court sentenced Moss to 384 months in prison and noted that he received the equivalent of two years for the obstructive conduct.

## II. Discussion[1]

The District Court determined Moss's base offense level by applying U.S.S.G. § 2D1.1(a) and applied an obstruction-of-justice enhancement under U.S.S.G. § 3C1.1. Moss does not question the District Court's legal interpretation of those guidelines. Instead, he challenges its factual findings related to drug quantity, drug purity, and application of the obstruction-of-justice enhancement. As with all "facts relevant to sentencing," the government's burden of proof is a preponderance of the evidence. *United States v. Grier*, 475 F.3d 556, 568 (3d Cir. 2007) (en banc). We review the District Court's "factual findings relevant to the Guidelines for clear error." *United States v. Kirschner*, 995 F.3d 327, 333 (3d Cir. 2021). The clear error standard is highly deferential:

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence

---

[1] This Court has appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. The District Court had subject-matter jurisdiction under 18 U.S.C. § 3231.

4

differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*United States v. Caraballo*, 88 F.4th 239, 244 (3d Cir. 2023) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573–74 (1985)).

Moss points to three of the District Court's factual findings as clearly erroneous. First, he argues the record does not support the finding that he purchased 15 pounds of methamphetamine. We disagree. The government presented ample evidence of the amount of drugs purchased. For the October 27–28 purchase, the District Court based its finding on (1) recorded phone calls between Moss and Santiago in which they discussed buying ten pounds of methamphetamine, (2) cellphone data showing Moss and Santiago traveled to Reading after those discussions, (3) Moss's text messages on the way back from Reading broadcasting that he had "ice" for sale, and (4) statements from Moss confirming he "bought ten pounds of ice" in Reading. App 13. For the November 11 purchase, the District Court relied on (1) cellphone data and texts that revealed Moss and Santiago traveled to Reading that day and (2) texts and recorded calls from November 12 confirming that Moss and Santiago had five "pound traps" lined up to sell following another trip to Reading. App. 13–14. Given the deferential clear error standard, the District Court's finding is no doubt a "plausible" interpretation of the evidence that Moss and Santiago purchased fifteen pounds of methamphetamine. *Caraballo*, 88 F.4th at 244.[2]

---

[2] Even if we found clear error on the five-pound purchase, the guidelines range would be the same. At the relevant purity level, ten pounds and fifteen pounds result in the same base offense level. *See* U.S.S.G. § 2D1.1(c)(2). "If a district court makes an error in its drug quantity determination that does not affect the base offense level or Guidelines range, the error is harmless." *United States v. Diaz*, 951 F.3d 148, 159 (3d Cir. 2020).

Second, Moss contends that the District Court unreasonably relieved the government of its burden of proof when it assigned the methamphetamine purchased in Reading a purity level of 62%. In determining drug *quantity*, our precedent instructs that "some degree of estimation must be permitted," particularly because "the government usually cannot seize and measure all the drugs that flow through a large drug distribution conspiracy." *United States v. Collado*, 975 F.2d 985, 998 (3d Cir. 1992). For methamphetamine offenses, "purity matters" because the district court must consider the quantity of pure or "actual" methamphetamine to determine the offense level. *United States v. Johnson*, 94 F.4th 661, 664 (7th Cir. 2024) (quoting *United States v. Carnell*, 972 F.3d 932, 939 (7th Cir. 2020)); *see also* U.S.S.G. § 2D1.1(c) n.B (providing that sentencing courts are to "use the offense level determined by the entire weight of the mixture or substance, or the offense level determined by the weight of the . . . methamphetamine (actual), whichever is greater").

Applying the same principle to *purity* as we do to *quantity*, some degree of estimation by the sentencing court must be acceptable. Other circuits have found it appropriate for a district court to estimate the purity of unseized drugs based on the purity of seized drugs. In *United States v. Newton*, the defendant challenged the district court's purity calculation for "unrecovered" methamphetamine because its purity was "impermissibly uncertain." 31 F.3d 611, 614 (8th Cir. 1994). Because a district court "may estimate total drug quantity based on evidence that reasonably supports a factual finding," the Eighth Circuit held that "[t]he district court properly relied on the purity level of the [methamphetamine] actually seized." *Id.*

In *United States v. Lopes-Montes*, the Ninth Circuit noted its alignment with the Eighth and Seventh Circuits in affirming a sentence based on a drug purity estimate calculated using seized methamphetamine. 165 F.3d 730, 732 (9th Cir. 1999). The *Lopes-Montes* court explained that "using the purity of drugs actually seized to estimate the purity of the total quantity of drugs . . . is an appropriate method of establishing the base offense level." *Id.*

In a more recent case, the Seventh Circuit found that the district court erred in assuming that unseized

6

methamphetamine was 100% pure and should have estimated purity based on the methamphetamine actually seized from the defendant. *Johnson*, 94 F.4th at 664. Similar to the drugs seized in this case, the drugs seized in *Johnson* were of varying levels of purity. *Id.* The Seventh Circuit held that the district court committed plain error because the 100% purity estimate led to a higher guidelines range than would have applied if the district court had used the lowest purity level from the seized drugs. *Id.* at 664–65. "When faced with competing estimates of drug purity," the Seventh Circuit explained that it "encourage[s] district courts to err on the side of caution and select the more conservative estimate." *Id.* at 664.

We agree with our sister circuits that it is reasonable for a district court to estimate the purity of unseized drugs based on the purity of drugs seized from the defendant. And we echo the guidance provided by the Seventh Circuit to exercise prudence and favor the more conservative estimate when purity levels vary.

That is precisely what the District Court did here. It assigned a purity level based on the lowest purity sample purchased directly from Moss. Rather than assign a significantly higher purity level based on samples from the other controlled purchases or samples from drugs seized at the homes of co-conspirators, the District Court selected the more conservative estimate. Given the short amount of time between the controlled purchases and the bulk purchases by Moss and Santiago, its determination that the drugs were at least 62% pure was not clearly erroneous.

Finally, the District Court's factual findings underlying the obstruction-of-justice enhancement are not clearly erroneous. The District Court considered ample evidence in making its determination—including testimony from the cooperating co-conspirator about the threatening notes he received as well as communications between Moss and his girlfriend confirming that he intended to expose the co-conspirator by recording the proceedings. Taken together, the District Court had significant evidence supporting the enhancement, and thus the decision to apply it was not clearly erroneous.

### III. CONCLUSION

For the foregoing reasons, we will affirm the judgment of sentence entered by the District Court.